OCEAN SCIENCE & ENGINEERING, INC., a Delaware Corporation, and Willard N. Bascom

v.

The UNITED STATES.

No. 239–75.

United States Court of Claims.

Jan. 18, 1979.*

George E. Wise, Los Angeles, Cal., attorney of record for plaintiffs. James F. Davis, Los Angeles, Cal., Howrey & Simon,

*This decision was filed with the clerk and made available to the parties on January 18, 1979, but not published to allow defendant an opportunity to advise whether publication was objectionable on security grounds. Defendant has now advised that the opinion contains no classified information, and, accordingly, it is published on the regular March announcement day of this court, for whatever precedential value it may have.

Washington, D. C., Susan E. Anderson, Wise, Wise & Nelson, Brownell Merrell, Jr., and Dietsch, Gates, Morris & Merrell, Los Angeles, Cal., of counsel.

Thomas J. Scott, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Vito J. DiPietro, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and SMITH, Judges.

## OPINION

PER CURIAM:

This case is before the court on the parties' exceptions to the opinion, findings of fact, and conclusions of law of Trial Judge Francis C. Browne, submitted in accordance with Rule 134(h). Trial Judge Browne determined that the United States had neither infringed the patent of Willard Bascom (Count I of the petition), nor breached an implied contract of confidentiality between the government and plaintiffs (Count II). Although plaintiffs disagreed with the trial judge's resolution of their claims under both counts, in order to simplify the issue on appeal, they chose to focus on the infringement issue, and did not except to the trial judge's findings relating to Count II.

Due to the classified nature of the material involved in this case, the proceedings were all conducted *in camera*. However, we are able to state the reasons for our decision publicly without reference to any classified material. After consideration of the briefs and arguments of counsel, we agree with Trial Judge Browne to the extent indicated, and the court adopts his decision with the modifications discussed below as the basis for its judgment in this case. Thus, plaintiffs are not entitled to recovery and their petition is dismissed.

We have deleted from the trial judge's opinion the portion discussing the issue of extra-territoriality in order to avoid the impression that the issue is easily disposed of in this case, and we do not decide this issue.

He admitted that this would be dictum if we agreed with him, as we do, on the infringement issue. The novelty of Bascom's concept is his creative combination of traditional devices to obtain the desired result—the location of underwater objects. The method used by the United States for this purpose and allegedly infringing Bascom's patent was operational only on the high seas—outside the United States, as defined in the patent laws as "the United States of America, its territories and possessions." 35 U.S.C. § 100(c). Yet the patent laws protect only against the manufacture, use, or sale of a patented invention "within the United States." 35 U.S.C. § 271. Referring to this country's historical distaste for monopolies, the Supreme Court has strictly limited the scope of patent laws (which create monopolies) to the express provisions of the statute. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229–30, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). Faced with these narrow limits, the Supreme Court ruled that the assembly of spare parts of a device to devein shrimp could not infringe U. S. patent laws although the parts were manufactured in the United States, because the novelty that made the idea patentable was in the combination of the parts, and that combination took place outside the territorial United States. *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972). *See also Decca, Ltd. v. United States*, 544 F.2d 1070, 210 Ct.Cl. 546 (1976) for a discussion of this problem.

In *Decca* we decided not to apply or reject the fiction that a United States flag ship or plane is an ambulatory portion of United States territory. Deeming it a "juridical prop" that could be dispensed with, we found jurisdiction in the fact that the alleged infringing device, the Omega worldwide system to fix the location of ships and planes, employed beside receivers on the ships and planes and "slave" stations in foreign countries, its necessary "master" stations wholly in the United States.

The trial judge relied on *Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 97

L.Ed. 252 (1952) which, however, interprets the Lanham Act to authorize an injunction against a trademark infringement in a foreign country. The opinion construes the legislation as stating an affirmative intent to apply as broadly as the constitutional powers of Congress permit. Of course, the constitutional power of Congress to make our patent laws applicable to processes carried out on U. S. flag ships and planes at sea is not challenged; the question is whether Congress has done so in view of the Supreme Court's doctrine of strict construction.

Perhaps the patent bar will note the possible loophole in the coverage of the U. S. patent laws and will invite the attention of Congress to it. Meanwhile, it is well to adjudicate cases on other grounds when possible, as we do this case.

Another complex issue appears in this case as an affirmative defense for the government. The government argues that Mr. Bascom conceived the invention at issue while employed by the National Academy of Sciences under a National Science Foundation research grant, and that the provisions of that grant entitle the United States to a royalty-free license to practice any invention made in the course of work done under that grant. Trial Judge Browne ruled that Bascom did not conceive the idea in the course of work done under the grant, since Bascom visualized and gave form to the idea on Christmas Eve, on his own free time, and without employing materials or facilities of the National Academy of Sciences. Since our ruling on the subject of infringement allows us to refrain from determining whether the government has such a right to a license under these circumstances, we omit Trial Judge Browne's discussion of the issue, and reserve for another time consideration of the scope of patent rights clauses commonly found in government research grants. We also have omitted the trial judge's discussion of other affirmative defenses unnecessary for resolution in this case.

The court adopts the trial judge's findings of fact as its own, except for the third sentence of finding 14 and findings 42–46, which are not adopted. The said findings are not printed herewith as they have been furnished to the parties.

Trial Judge Browne's opinion, as modified, is printed below.

## OPINION OF TRIAL JUDGE

BROWNE, Trial Judge: Ocean Science & Engineering, Inc., a Delaware corporation (hereinafter OSE), and Willard N. Bascom (hereinafter Bascom) filed a "Petition for Infringement of Letters Patent and Breach of Implied Contract" in this court on July 16, 1975. The United States of America (hereinafter defendant) filed its answer to the petition on January 13, 1976. As a result of informal discovery plaintiffs determined that they should voluntarily dismiss any claim for infringement of United States Letters Patent 3,472,191 by defendant and, on July 16, 1976, filed a stipulation under Rule 39 permitting the filing of a "First Amended Petition for Infringement of Letters Patent and Breach of Implied Contract" on the same date. Defendant filed its answer to the amended petition on August 16, 1976. After completion of all discovery, trial was commenced on Tuesday, April 12, 1977, and testimony was concluded on Monday, May 2, 1977. A final trial session was held on Thursday, May 12, 1977, at which session this opinion was rendered orally.

Plaintiffs seek recovery of reasonable and entire compensation for defendant's alleged infringement of United States Patent 3,215,976, issued November 2, 1965, on Application Serial No. 221,402, filed August 30, 1962, which application was a continuation in part of Application Serial No. 209,406, filed July 12, 1962. This Count (Count I) arises under 28 U.S.C. § 1498. More specifically, plaintiffs allege that defendant has infringed the claims of the patent by using the claimed invention "upon a vessel known as the 'Glomar Explorer' which was manufactured in accordance with and uses the inventions disclosed and claimed in plaintiff Ocean Science & Engineering's said Letters Patent."

Plaintiffs also seek recovery of damages for breach of express and implied contract by defendant's use of certain alleged trade secrets and confidential information without compensating plaintiffs. This Count (Count II) is asserted under 28 U.S.C. § 1491.

In addition plaintiffs pray for recovery of reasonable attorneys' fees and court costs in the prosecution of their claims.

This court has jurisdiction of both Counts of the petition under 28 U.S.C. § 1498 and 28 U.S.C. § 1491, respectively. Bascom, having assigned to OSE his entire right, title and interest to the patent in suit, is a proper, but not indispensable party to Count I of the petition. Bascom is an indispensable party with respect to Count II. OSE is not a proper party to Count II of the petition with respect to transactions or occurrences prior to February 19, 1962, the date of incorporation of OSE as a Delaware corporation, in the absence of evidence of its having lawfully acquired rights in the claim it asserts in Count II of the present action.

## COUNT I

### A. The Patent Claim

Willard N. Bascom, while employed by the National Academy of Sciences (hereinafter NAS), was engaged in studies and operations in the field of oceanography. Beginning, however, about July 12, 1958, he served as Executive Secretary of an *ad hoc* group organized under the auspices of NAS and identified as the "AMSOC Committee." The function of this committee was to study the feasibility of drilling a hole through the earth's "crust" and possibly through the earth's "mantle" in a deep ocean location. Ultimately a project was developed under the name "Mohole" to implement the studies. The project was carried forward under a grant from the National Science Foundation (hereinafter NSF), an agency of the United States of America.

Bascom became Technical Director and ultimately Director of the Mohole Project.

In addition, he was designated as the "Technical Representative" of NSF under a contract between NSF and Global Marine Exploration Company (later Global Marine, Inc., and hereinafter Global Marine) for the modification of an existing vessel (identified as CUSS I) for use in execution of the Mohole Project.

In April 1961 the first stage of the Mohole Project was conducted by drilling holes as much as 600 feet below the ocean floor (which was 10,000 to 12,000 feet below the ocean surface) off the island of Guadalupe, which is located off the west coast of Mexico in the Pacific Ocean.

Having successfully completed the first stage of the Mohole Project it was determined that the second stage of the project would be pursued under a contract with the well-known firm of Brown & Root, which firm was the low bidder in competition with Global Marine and others.

The award of the contract to Brown & Root was disappointing to members of the NAS staff, and particularly the staff of the AMSOC Committee.

On Christmas Eve in 1961 (December 24, 1961) Bascom conceived the idea of equipping the end of a drill string in deep ocean waters (from 12,000 to 20,000 feet or more below the ocean surface) with means for viewing the ocean bottom in the vicinity of the end of the drill string. He also contemplated the use of a retrieval device at the end of the drill string to bring to the ocean surface objects discovered on the ocean floor. The essence of his concept, however, was to use the viewing system (together with suitable electronic gear) to prepare a bathymetric survey of the area of the ocean floor to be searched. With the bathymetric survey thus prepared, showing the elevations of geographical contours above the ocean floor (and conversely the depth of such features below the ocean surface), a search plan could be developed for closer inspection, identification and retrieval of objects from the floor of the ocean. The disclosure notes prepared by Bascom were shown and explained to his wife late that Christmas Eve and she witnessed the docu-

ments by signing her name to them at that time.

Bascom and some of his associates on the AMSOC staff discussed the formation of a corporation (to be known as Ocean Science & Engineering Company) to exploit Bascom's concept.

Bascom prepared a formal proposal for the purpose of obtaining the interest and support of defendant in putting the concept into practice, hopefully in competition with Brown & Root, Global Marine and others who were also interested in obtaining Government contracts for deep ocean exploration and operations. The date on which the first submission was made to defendant is in dispute. Bascom contends that a written proposal was submitted to representatives of defendant personally on January 25, 1962, and also submitted under cover of a letter dated January 31, 1962, addressed to the representative of the defendant to whom the proposal was previously delivered in person. We have only Bascom's sworn, but uncorroborated, testimony as to the submission in person on January 25, 1962. In addition to Bascom's sworn testimony a carbon copy of a letter dated January 31 was produced by Bascom to establish transmission of a copy of the proposal to the representative of the defendant, but he could not recall with any certainty whether the original of the letter of transmittal and the enclosure were sent by mail or delivered in person. Notwithstanding intensive efforts to locate copies of the proposal or the letter of January 31, 1962, in the files of defendant's agencies, no such evidence was located or produced at trial.

The record is clear that more than one copy of the proposal was prepared. At least one copy carries the legend "Proprietary," while some other copies do not carry any such legend. In both cases, the cover pages bear the date of January 25, 1962, but that date is indicative, at best, of the date by which the typing of the first document was completed.

It is significant to note that all copies of the document show, on the cover pages thereof, both the name Willard N. Bascom

and the designation "Ocean Science & Engineering Company," notwithstanding the fact that OSE was not incorporated until February 19, 1962, under the name Ocean Science & Engineering, Inc. The significance of these legends will be discussed in this opinion with respect to Count II.

Bascom submitted to his patent attorney two disclosure documents setting forth in considerable detail the concept which Bascom believed to be inventive and patentable. The authenticity of these documents and the completeness thereof are firmly established. The date of first disclosure to the patent attorney is also firmly established as being January 31, 1962.

One of defendant's employees admitted having seen a copy of the Bascom disclosure bearing the January 25, 1962, date not later than February 6, 1962. This fact, however, is not of great significance since Bascom submitted substantially the same proposal to various persons in various agencies of defendant in the spring of 1962. In fact, after submitting the proposal to a representative of the United States Air Force Bascom executed a "Form 91" on April 16, 1962, indicating that he was submitting the proposal subject to the Air Force policy regarding submission of unsolicited proposals.

An Application for Patent (Serial No. 209,406) was filed by Bascom on July 12, 1962. He also assigned his entire right, title and interest in the application and the inventions shown or claimed therein to Ocean Science & Engineering, Inc.

The application filed July 12, 1962, was incomplete in that numbered pages 5, 6 and 12 were missing. The application which matured into the patent in suit, namely Application Serial No. 221,402, was filed August 30, 1962. Inasmuch as there were some differences between the later-filed application and the earlier-filed application, the later-filed application was designated as a continuation-in-part of the earlier-filed application. Accordingly, the later-filed application will be accorded the filing date of the earlier-filed application only as to matters common to both.

Reducing the Bascom concept to its simplest terms, the method comprises the steps of determining the topographical contours of a portion of the floor of the ocean and thereafter searching the ocean floor by means of a pipe suspended from a ship floating on the surface of the ocean, one or more sensing elements such as sonar or television being affixed to the free end of the pipe which is near the bottom and moving the ship along a course corresponding to the contours in such a manner as to keep the free end of the pipe and the sensing elements at a relatively constant distance from the ocean bottom or floor.

None of the references cited by the examiner nor any of the evidence adduced at trial shows the concept just described. Indeed, knowledgeable witnesses for defendant, as well as plaintiff, testified that they considered this to be the novel aspect of Bascom's teaching.

Inasmuch as each of the 12 claims in suit are concatenately related, the validity of each of Claims 2 to 12, inclusive, is sustained to the extent that the aforementioned novel concept is embodied not only in Claim 1 but also in all claims directly or indirectly dependent thereon.

For sake of clarity, Claim 1 is quoted from the patent in suit as follows:

1. The method for surveying the ocean bottom from a moving ship equipped with navigation equipment for determining location relative to a plurality of positioned transponders, comprising the steps of

(1) establishing the approximate area of search by known navigational techniques,

(2) marking such area by a first deep moored buoy equipped with a transponder,

(3) defining an area of search by locating a plurality of further deep moored buoys equipped with similar transponders about the search area,

(4) moving the ship along a predetermined pattern in said area of search by means of the navigation equipment on the ship responding to the transponders,

(5) making a detailed bathymetric survey of the topography of the sea floor along said pattern with an echo sounder located on said ship to establish bottom contours.

(6) formulating a specified search plan on the ocean floor following said contours at a relatively constant depth,

(7) lowering a sensing element on the end of a pipe vertically under the ship near the bottom, and

(8) moving the ship about the contours in accordance with said plan to keep the sensing element at a relatively constant distance from the bottom.

Claim 2 incorporates all of the foregoing language of Claim 1 but provides a further step of: Recording the precise position of the ship relative to said deep-moored buoy systems while making said bathymetric survey.

Claim 3 is also dependent upon Claim 1 but includes an apparatus limitation in that the pipe on which the sensing element is mounted is not only weighted but also is provided with fairing elements.

Claims 4 and 5 are directly dependent on Claim 2 and therefore carry forward the limitations of both Claims 1 and 3, Claim 4 adding the further limitation with respect to the orientation of the faired pipe relative to the resistance encountered as a consequence of movement of the pipe through the water.

Claim 5 simply adds the further limitation of constantly presenting to the ship, via a cable secured within the fairing on the outside of the pipe, the information obtained through the sensing element.

Claims 6 and 7 are both dependent directly on Claim 5 and therefore indirectly dependent on Claims 1 and 3. Claim 6 adds the further limitation of continually determining the precise position of the sensing element with respect to the ship from which it is suspended. Claim 7 differs from Claim 6 in that it provides for a second movement of the sensing element over the bottom but obtains a different view or aspect by rotating the pipe upon which the sensing ele-

ment is suspended, thereby allowing a view through a predetermined scanned angle.

Claim 8 adds to the limitation of Claims 7, 5, 3 and 1 the obvious step of inspecting and identifying objects detected by the sensing element.

Claims 9 through 12, inclusive, contemplate the pumping of water down the pipe either to actuate a turbine to generate electricity or to assist in accurately positioning the sensing element. Claim 11, which is dependent on Claim 10, recites the self-evident step of lowering pickup means connected to the pipe to retrieve objects on the ocean floor.

Bascom contends that his invention is particularly applicable, and perhaps critically limited, to use at depths of the order of 20,000 feet below the surface of the ocean. However, none of the claims are limited to any particular depth and, accordingly, must be construed as being applicable to all depths. The only inference that may be drawn to suggest that the claims apply to operations at considerable depth is the reference to deep-moored buoys. However, there is no indication that this reference to apparatus employed in performing the method has a direct bearing on the method itself. Thus, the claims are equally applicable to all depths of the ocean.

Although none of the prior art references, either in the nature of patents or publications, directly anticipate any of the claims of the Bascom patent, each of the claims must be narrowly construed so as to be applicable only to a method in which a ship equipped with a pipe having a sensing element mounted on the free end thereof moves about a course corresponding to the ocean bottom contours in such a manner as to maintain the sensing element suspended at the end of the pipe at a relatively constant distance from the bottom of the ocean.

In reaching the foregoing conclusions due consideration has been given to the prior art patents and publications relied upon by defendant (defendant's exhibits 53 through 61), as well as a review of the references cited by the examiner during the prosecution of the application which resulted in the patent in suit.

The "Proceedings of the Symposium on Aspects of Deep Sea Research," published in 1957, is particularly revealing as a summary of the state of the art of oceanography as of that time. The symposium was chaired by Dr. C. O'd. Iselin, and the list of those attending appears to be a "Who's Who" of oceanographers of the day, including Bascom, Professor J. D. Isaacs and Dr. R. A. Frosch, all of whom testified during the trial of this case. Dr. Iselin was cognizant of the problems of deep ocean exploration and equally aware of the need to go outside the area of the special competence of oceanographers to obtain and develop the technology required to overcome those problems. He made specific reference to the adaptation of oil well logging technology to the cable problems and also speculated on the use of buoyant and faired cables.

The attendees at the symposium unanimously agreed to a resolution favoring the immediate initiation of a national program, the object of which would be to obtain for the United States undersea vehicles capable of transporting men and their instruments to the great depths of the oceans. More specifically, the resolution endorsed the concept of the bathyscaphe as a technically feasible vehicle for this purpose. The resolution obviously was a compliment to Jacques Piccard, one of the developers of the bathyscaphe *Trieste*, who was in attendance at the symposium and delivered a paper describing some of the technical details of the *Trieste*.

As early as 1942 a system had been devised for locating, identifying and recovering sunken vessels from depths of 10,000 to 15,000 feet. Such a system, described in Gross Patent 2,421,377, issued June 3, 1947 (on an application filed November 30, 1942), included the use of oil well drill pipes extending from a ship at the surface to the hull of a sunken vessel on the ocean floor. It also disclosed a string of drill pipe suspended from a ship at the surface and having means of illuminating the ocean floor and means for viewing the illuminated area

carried at the end of the pipe near the ocean floor.

About a year after the Gross application was filed, Walter B. Lang (apparently a Government employee) filed an application for patent which issued as Patent 2,355,086 on August 8, 1944. Lang's application related to the suspension of a clam-type scoop from a vessel by means of a cable, the clam-shell scoop being equipped with a television camera and illumination means which would enable personnel aboard the ship at the surface to observe the object to be retrieved during the course of location and retrieval.

During the decade of the 1950's several applications for patent were filed relating to ocean-bottom exploration, including an application filed August 31, 1953, by Jesse C. McCormick. This application matured into Patent No. 2,928,367, issued March 15, 1960. McCormick disclosed a device to be towed beneath the surface of a body of water in such a manner as to be maintained at a substantially constant height above the bottom of the body of water while locating or detecting objects, such as mines or the like, located on the bottom. The submerged vehicle is not shown as being tethered to a ship or other means floating on the surface of the water, but it would not involve invention to so arrange the control station with respect to the underwater device instead of controlling it from the shore as contemplated in the patent.

Reistle, Jr., Patent 3,032,105, issued May 1, 1962, on an application filed October 19, 1959, closely approximates the Bascom concept in most respects. It differs from the Bascom concept in that it does not disclose the teaching of moving a ship on a course following the contours of the ocean bottom, although it does disclose the concept of keeping the lower end of a drill pipe, equipped with a television camera and illumination means, substantially a constant distance from the ocean bottom in the course of locating a preexisting well bore for the purpose of reentering it with a drill string or other drilling equipment.

If, in lieu of mooring the surface vessel in position over the preexisting bore, greater mobility had been desired, the skill of the art had advanced to the point where the vessel could be maintained in a substantially stationary position by coordinated control of counterthrusting propulsion means such as those shown in Shatto, Jr., et al., Patent 3,187,704, issued June 28, 1965, on an application filed March 14, 1961. Still another patent showing this concept is Kolb, et al., Patent 3,145,683, issued August 25, 1964, on an application filed August 22, 1961.

It is apparent from the foregoing that, prior to December 24, 1961, all of the elements necessary to perform a method of locating, identifying and retrieving objects from the deep ocean floor were within the skill of the art to which Bascom's invention pertains. The only thing missing up to that time was Bascom's contribution of the concept of plotting the course of a ship to follow the bottom contours of the ocean while observing the ocean bottom along those contours by means of sensing elements located on the end of a drill string carried by the ship. Bascom's mathematical computations as set forth in the patent in suit clearly indicate that he contemplated a dynamic, rather than static or intermittent motion system of search, identification and retrieval from the ocean floor.

It was developed by testimony during the trial that Bascom's concept was not practical where the course of the ship conducting the search, identification and retrieval operation is other than parallel to the contours of the ocean bottom in the area under investigation and operation. If, for example, the course of the ship is perpendicular to the contours contemplated by Bascom, there is considerable danger that the end of the drill pipe and the sensing elements mounted thereon would strike the underwater terrain and the equipment and drill string would be damaged or lost. Notwithstanding these practical observations, it cannot be said that the Bascom concept is inoperative, albeit the concept may be so sophisticated as to be impracticable.

## B. *The Accused Infringement*

Plaintiffs allege infringement of the claims of the Bascom patent by use of the claimed invention upon an American-registered, U.S. Government owned and operated vessel identified as the *Glomar Explorer.* Plaintiffs further contend that the vessel was manufactured in accordance with and makes use of the inventions disclosed and claimed in the Bascom patent. Although the petition does not set forth sufficient facts upon which defendant's ownership or control over the vessel may be established, the evidence at trial was sufficient to establish that defendant is liable in the event the patent has been infringed and is enforceable.

Upon consideration of the documentary evidence and testimony presented at trial, disclosing the use or uses of the *Glomar Explorer* actually made by defendant, it is concluded that the methods employed in the operation of the *Glomar Explorer* have not infringed any of the claims of the Bascom patent. The bases upon which this conclusion is reached are set forth in further detail in the paragraphs which follow.

The details of construction and operation of the *Glomar Explorer* are set forth in defendant's exhibit 17 to an extent sufficient to understand the relationship of the vessel to the asserted claims. In particular, the portion of the exhibit found in section 2.6 under the heading "Automatic Station Keeping System" describes the positioning and maintenance of the vessel within a prescribed range of the work area at the ocean bottom. Evidence as to the steps employed in locating the work area and positioning the vessel over that area are supplied by other documents and testimony of witnesses having direct knowledge of the operation of the vessel.

Applying the evidence to the elements of Claim 1 it is found that the *Glomar Explorer* is equipped with navigation equipment for determining location relative to a plurality of positioned transponders. The ship is self-propelled and therefore is a moving ship in the sense in which that phrase is used in Claim 1 of the Bascom patent.

The method employed by defendant in surveying the ocean bottom from the *Glomar Explorer* includes only six of the eight steps set forth in Claim 1 of the Bascom patent.

It is virtually self-evident that the approximate area of search or "work area" is established by known navigational techniques as called for in step 1 of Claim 1. Figure 2–23 of defendant's exhibit 17 shows that the area is marked by a first deep-moored buoy equipped with a transponder as called for by step 2 of Claim 1, and the area is defined by locating a plurality of further deep-moored buoys equipped with similar transponders located about the area as called for by step 3 of Claim 1. The ship is moved along a predetermined pattern or course in the area by means of navigation equipment on the ship responding to transponders or equivalent reference points as called for by step 4 of Claim 1.

The evidence established that the *Glomar Explorer* employed detailed bathymetric surveys of the topography of the seafloor within said area although such bathymetric survey was previously made by another vessel and followed by the *Glomar Explorer* in locating and designating the work area. It does not appear from the evidence that any detailed bathymetric survey of the topography of the seafloor was made with an echo sounder located *aboard a ship moving along a predetermined pattern* or which had an echo sounder located *thereon.* Nevertheless, a detailed bathymetric survey of the topography of the seafloor in the work area was employed in the operation of the *Glomar Explorer,* thus responding to step 5 of Claim 1.

The *Glomar Explorer* did not follow contours of the ocean bottom as called for by step 6 of Claim 1. Although it did maintain the end of the drill pipe, together with the attached sensing and recording devices, at a relatively constant depth from the surface of the ocean as called for by step 6 of Claim 1, it did so only when it was stationary. It cannot be said, therefore, that the essence of step 6 was employed in the operation of the *Glomar Explorer.*

A sensing element was lowered on the end of a pipe vertically under the *Glomar Explorer* near the ocean bottom as called for in step 7 of Claim 1.

The *Glomar Explorer* was "dynamically positioned" by operation of thrusters at the bow and stern of the ship to maintain it in a relatively stationary position with respect to the work area or the transponders. When the ship was moved it was moved from point to point and, in so doing, did not follow the ocean bottom contours. Neither did it keep the sensing elements at a relatively constant distance from the bottom while moving the ship from point to point.

Claim 2 is not infringed for the same reasons Claim 1 is not infringed. However, the *Glomar Explorer* did record the precise position of the ship relative to the deep-moored buoy systems while making the equivalent of bathymetric surveys.

Claim 3 has not been infringed by the *Glomar Explorer* since the *Glomar Explorer* did not use drill collars or other weights to provide a "weighted pipe" nor was the pipe employed by the *Glomar Explorer* equipped with fairing elements.

Inasmuch as Claims 4 through 12, inclusive, are either directly or indirectly dependent upon Claim 3, Claims 4 through 12, inclusive, are not infringed.

The omission of the drill collar weights and fairing elements called for by Claim 3 apparently had no adverse effect on the operation of the *Glomar Explorer.* Indeed, it appears from the evidence that the weight and dimensions of the pipe employed by the *Glomar Explorer* were, in and of themselves, sufficient to eliminate the necessity for additional weighting in the amount of 30,000 pounds or more as contemplated by the Bascom patent. Moreover, the evidence indicates that the ocean currents at the ocean floor depths of 18,000 to 20,000 feet are negligible, thus rendering fairing elements unnecessary at most of the depths to which the *Glomar Explorer* extended the drill pipe.

Claim 4 is not infringed since the *Glomar Explorer* neither was equipped with faired pipe nor moved in a pattern such that the pipe would encounter less resistance from the water as the ship moved from point to point.

Although information obtained from the ocean bottom was constantly presented to the ship via a cable, there was no fairing on the outside of the pipe within which such cable could have been secured. Thus Claim 5 is not infringed.

Claim 6 was directly dependent on Claim 1. Since we held that Claim 1 was not infringed because the *Glomar Explorer's* operations did not depend on following the ocean's contours, or on keeping the sensing elements at a relatively constant distance from the bottom of the ocean, Claim 6 is not infringed, even though the *Glomar Explorer* did continually determine the precise position of the sensing element relative to the ship during all recorded operations.

Claim 7 has not been infringed by the *Glomar Explorer* since there is no evidence that the pipe employed by the *Glomar Explorer* was rotated for the purpose of obtaining a different aspect of the work area. A different aspect of the work area was obtained by the *Glomar Explorer* by moving the ship and thereby moving the sensing element attached to the pipe. To the extent that the sensing element was capable of movement with respect to the pipe, such movement would not constitute infringement of Claim 7 which calls for rotating the pipe with respect to the ship.

Claim 8 is not infringed, since the step of inspecting and identifying objects detected by the sensing element infringes Bascom's patent only if Claims 1, 3, 5, and 7 infringe the patent.

Since there is no evidence that a stream of water was forced down the pipe of the *Glomar Explorer,* either to actuate a turbine in the pipe, or to give a jet effect to move the sensing element, Claims 9, 10, and 12 are not infringed.

Claim 11 is not infringed since it is dependent on Claim 10.

In conclusion, none of the claims of the Bascom patent have been infringed by defendant.

## C. *Conclusion*

The plaintiffs' petition is dismissed as to Count I.

## COUNT II

### A. *Breach of Express or Implied Contract*

■ Plaintiffs allege in their second count that, prior to filing the complaint, they had discovered, created, developed, improved, manufactured and marketed techniques, plans, programs and equipment for the recovery of objects from the ocean floor and had acquired extensive amounts of valuable research, development and manufacturing data, information, techniques and know-how relating to the design, development, improvement and manufacture of vessels and related equipment pertaining to the recovery of objects from the deep ocean floor. Plaintiffs further allege that such matters constituted "confidential information" which was and remains the exclusive property of plaintiffs.

■ There is no evidence that OSE, except through Bascom, created or acquired any so-called "confidential information." Inasmuch as Bascom assigned his entire right, title and interest in and to his inventions to OSE after its incorporation on February 19, 1962, all rights of Bascom, individually, which were disclosed in the applications which resulted in the patent in suit were merged into OSE as indicated in the discussion of Count I above. There is no mention in the issued patent of use of a surveying and searching (or drilling or mining) vessel as a "cover" for other operations of such a vessel. However, a proposal submitted by Bascom to defendant prior to the date of incorporation of OSE (February 19, 1962) carried on the cover thereof both Bascom's name and the legend "Ocean Science & Engineering Corp." Inasmuch as plaintiff OSE was not incorporated as of that date and there is no evidence that any corporation such as "Ocean Science & Engineering Corp." was in existence prior to February 19, 1962, OSE cannot establish any rights of its own antedating February 19, 1962. The concept of using a vessel as a

"cover" for operations of such vessel was not conveyed by the assignment of Bascom's other rights to OSE subsequent to its incorporation. However, Bascom's widespread dissemination of the concept is evidence of his forfeiture of any claim of confidentiality. *Gray v. Eskimo Pie Corp.,* 244 F.Supp. 785 (D.Del.1965). Accordingly, Count II is dismissed as to Bascom, individually.

■ Prior to the issuance of the patent in suit Bascom, acting on behalf of OSE, submitted to the Central Intelligence Agency, the Department of the Air Force and the National Aeronautics and Space Administration unsolicited proposals containing information commensurate with that set forth in the patent in suit, but also containing a reference to the use of the Bascom vessel as a "cover" for intelligence operations. Under the holding of the Supreme Court of the United States in *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), it was permissible for Bascom or OSE to seek and obtain patent protection on part of the data otherwise considered to be in the category of trade secrets and know-how and yet maintain certain features in confidence. All claims of Bascom and OSE as to confidentiality of the matters *disclosed in the patent* were waived upon issuance of that patent. If certain technical data and information necessary to render the patent disclosure operative was withheld, OSE ran the risk of having the patent declared invalid for insufficiency of disclosure or inoperativeness under 35 U.S.C. § 112. Since that is not the case, there remains only the "cover" concept which Bascom, individually, or OSE may treat as having been disclosed to defendant in confidence or as proprietary information.

Not all of the documentation furnished the agencies of defendant on behalf of OSE carried a legend which would indicate that the information contained therein was of a confidential or proprietary nature. Some documents, however, carried the legend "Proprietary" with no further explanation of the meaning of that term or creating any

express or implied obligation on the part of the party to whom it was submitted to compensate OSE in the event the defendant employed the concepts disclosed therein.

After submission of the proposal to the Department of the Air Force Bascom executed a "Form 91" on behalf of OSE which acknowledged the conditions under which the Air Force would receive and consider the unsolicited proposal. Although this form disavows any intention on the part of the Air Force to utilize any truly confidential matter without compensating the submitter, it also sets forth various grounds on which the information submitted might be used without liability to the submitter. No similar form was executed on behalf of either Bascom or OSE with respect to the submissions to other agencies. Nevertheless, none of the agencies to whom the proposal was submitted accepted the proposal. In fact, the proposal was affirmatively rejected by each of the agencies to which it had been submitted. While members of the intelligence community considered the proposal to be extremely interesting, OSE was advised that for various reasons, some of which were fiscal in nature, none of the agencies would award a contract to OSE.

While the record clearly establishes that there was transmission of the OSE proposal to various persons within the respective agencies and joint discussions were held between the Central Intelligence Agency and the Department of the Air Force, there is no evidence that any of the numerous copies of the proposal which were in existence were furnished by defendant to non-Government entities or personnel.

The record does establish that others, including Global Marine, Lockheed Aircraft and Aerojet-General, were invited to study and submit proposals for construction and operation of deep search and retrieval vessels suitable for use as a "cover" for intelligence operations in the early 1960's.

This concept was not unknown to the public inasmuch as there was published in 1955 a book entitled *The Secret Raiders* in which the author, David Woodward, illustrated and described the operations of a number of ships used during World Wars I and II as "cover" for military and intelligence purposes.

Subsequent to the submission by OSE of its proposal to the agencies of defendant there was much publicity concerning the efforts to retrieve the sunken submarine *Thresher*. It was also a well-known fact that Global Marine had been working under contracts with the National Science Foundation, whereby the public was already aware of the collaboration between Global Marine and the United States Government in connection with ocean operations. The evidence also establishes that Global Marine was sought out by the Michigan Limestone Division of the United States Steel Corporation to submit a proposal for locating, investigating and possibly recovering one of its ships which had sunk in the Great Lakes. Global Marine's association with ocean-bottom mining operations was known in 1960 as a result of its work in conjunction with Collier Carbon & Chemical Corporation in the vicinity of the "40-Mile Bank" off the coast of California.

It is not surprising, in view of Global Marine's involvement with deep ocean technology, that Global Marine was sought out in January and February 1962 by the Navy to outline Global Marine's OTO (other than oil) experience and capabilities which might be of interest to the Navy in its deep sea search and recovery requirements.

With its extensive experience and existing engineering personnel and facilities Global Marine cannot be said to have drawn upon anything submitted to defendant by OSE in carrying out its contractual obligations with defendant or in submitting its proposals for various Government requirements. Although OSE had an office it had no plant facilities, no apparent financial responsibility, no prior experience except that possessed by its organizers and no public reputation by which it would be recognized as anything but a scientific research organization. It certainly had no reputation as a drilling or mining enterprise either domestically or internationally. In short,

OSE did not establish by the evidence in this case that it would have had the capability of performing a contract of the nature contemplated by its proposals even if defendant had entered into such a contract with OSE.

■ It is concluded that OSE did not impart to defendant anything ·of value when it made its unsolicited proposal to use a deep ocean surveying and searching (or mining or drilling) vessel as a "cover" for clandestine, semi-clandestine, or other intelligence operations. Accordingly, there is a failure of consideration to support a contract either express or implied between defendant and OSE.

Even if the "cover" concept had value at the time it was disclosed to defendant, it had no value after November 1965, the time of issuance of the Bascom patent. The evidence in this case does not show any use of the concept prior to that time. In fact, it was not until after the Bascom patent issued that defendant solicited from non-Governmental entities proposals which would embody the "cover" concept. Even so, the evidence does not establish that the representatives of defendant who made the solicitation had any knowledge of Bascom's submission of the OSE "cover" proposals to any of the Government agencies.

■ It is well established by precedents in this court that there can be no recovery under the Tucker Act, 28 U.S.C. § 1491, for breach of a contract implied at law. Indeed, it takes a stronger showing than that made out by OSE in the present case to establish a contract implied in fact. In order to establish a contract implied in fact it would have been incumbent upon plaintiff to establish that defendant's use of plaintiffs' concept flowed directly from plaintiffs' submission and defendant's receipt thereof, not by mere coincidence. By the same token, OSE has failed to establish the existence of an express contract under which defendant would be obligated to pay OSE for anything.

By the very nature of intelligence operations there are many guises or covers which may be utilized in both overt and covert activities. Many such guises have been disclosed in works of fiction as well as true accounts of intelligence operations. To the extent that there may be various types of cover which have not become publicly known, it is unlikely that anyone outside the intelligence community would be apt to come up with a cover concept which was not either obvious to or employed previously by people in the intelligence community. While there is no evidence in the record of this case to establish that defendant was in possession of the cover concept disclosed by Bascom on his own behalf or on behalf of OSE at the time it was first disclosed to defendant, plaintiff has failed to show sufficient novelty in the concept to take seriously plaintiffs' contention as to its value.

It is inferred from the circumstances that OSE included its cover concept in its proposals to defendant's agencies primarily for the purpose of stimulating sufficient interest on the part of such agencies to enter into a contract with OSE to finance its earnest desire to conduct deep ocean research.

I am convinced that defendant's actions to date would have been no different if OSE had never made a proposal to any of defendant's agencies.

■ In conclusion, it is held that neither plaintiff has established a contract between Bascom or OSE and defendant, either express or implied, and therefore there has been no breach of contract by defendant for which either plaintiff is entitled to compensation, attorneys' fees, or court costs.

B. *Conclusion*

Plaintiffs' petition is dismissed as to Count II.

### CONCLUSION OF LAW

Plaintiffs' petition is dismissed as to all counts.